**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOARD OF EDUCATION OF THE CITY OF CHICAGO | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| UNITED STATES DEPARTMENT OF EDUCATION, LINDA MCMAHON, in her official capacity as Secretary of the DEPARTMENT OF EDUCATION, KIMBERLY RICHEY, in her official capacity as Assistant Secretary for Civil Rights, LINDSEY M. BURKE, in her official capacity as Deputy Chief of Staff for Policy and Programs, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## I.      TABLE OF CONTENTS

I.    TABLE OF CONTENTS .................................................................................................. 1

II.   INTRODUCTION ......................................................................................................... 2

III.  JURISDICTION AND VENUE .................................................................................... 4

IV.   PARTIES ....................................................................................................................... 5

V.    FACTUAL BACKGROUND ........................................................................................ 6

   A.   Chicago Public Schools ............................................................................................ 6

   B.   CPS Magnet Schools and the Magnet School Assistance Program Grants ....................... 6

   C.   CPS's Guidelines Regarding the Support of Transgender and Gender Nonconforming Students .................................................................................................................... 10

   D.   CPS's "Black Students Success Plan" ...................................................................... 12

   E.   OCR investigation into CPS's Guidelines and the BSSP ............................................ 12

   F.   ED's Illegal Discontinuation of CPS's MSAP Grants ............................................... 15

      1.   Non-Compliance with Title VI and IX Procedural Requirements .............................. 16

      2.   Non-Compliance with MSAP Statute and Education Department General Administrative Regulations, including 34 C.F.R. § 75.253 .................................... 18

G.    Impact of MSAP Grant Non-Continuation ........................................................ 23

VI.    CAUSES OF ACTION ............................................................................................ 25

VII.    PRAYER FOR RELIEF ......................................................................................... 37

## COMPLAINT AT LAW

**NOW COMES** the plaintiff, Board of Education of the City of Chicago, by and through its undersigned counsel, complaining against Defendants, the United States Department of Education, Linda McMahon, in her official capacity as Secretary of the Department of Education, Kimberly M. Richey in her official capacity as Assistant Secretary for Civil Rights, and Lindsey M. Burke in her official capacity as Deputy Chief of Staff for Policy and Programs, as follows:

## II.    INTRODUCTION

1.    In Chicago, magnet schools funded by the Magnet School Assistance Program (MSAP) serve a critical role, offering innovative curricula, specialized programs, and diverse learning communities that enable students to overcome long-standing racial, economic, and opportunity gaps. Chicago Public Schools (the "District" or "CPS") is one of the largest and most diverse school districts in the nation, and for the last ten years, the MSAP program has been central to CPS's efforts to expand educational access and choice, reduce educational disparities and segregation, and drive innovation.

2.    Less than two weeks before CPS's continuation period for its MSAP awards was set to begin, the U.S. Department of Education (the "Department" or "ED") issued a letter discontinuing the District's MSAP grants, based entirely on alleged violations of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

3.    The letter, however, fails to provide any specific factual findings relative to CPS's administration of MSAP, does not afford the procedural protections required by civil rights

2

laws, including notice and opportunity for a hearing, and further, failed to meet the minimum procedural requirements under the Department's own regulations in discontinuing a grant.

4. Perhaps the most striking fact in the Department's overreach is that the civil rights noncompliance allegations lodged in the Non-Continuation Letter, and the subsequent enforcement action to discontinue CPS's MSAP funding as a result, are apparently based on two pending civil rights investigations being conducted by the Department's Office of Civil Rights ("OCR").

5. Specifically, OCR opened two investigations in March and April of 2025 regarding CPS's draft plan, known as the Black Student Success Plan ("BSSP") and CPS's Title IX guidelines that ensure equal access for all students to use facilities, be involved in programs, and have access to activities, regardless of their gender identity.

6. CPS has—and continues—to fully cooperate with OCR in the ongoing investigations as CPS works to reach a resolution with OCR regarding the complaints.

7. Yet despite this ongoing cooperation with OCR, and without waiting for OCR's investigation to be completed and/or for OCR to issue any formal findings, the Department abruptly (and incorrectly) determined CPS to be noncompliant with civil rights requirements, demanding that CPS overhaul its policies within three days or lose its MSAP funding.

8. In response, when CPS requested that it be afforded adequate due process, or at a minimum, an additional 30 days to prepare its reconsideration request, the Department summarily refused.

9. On September 26, 2025, ED denied reconsideration and discontinued CPS's MSAP funding, including its access to previously awarded carryover, effective September 30, 2025. The decision was made without explanation, without adherence to laws and regulations, and without considering the significant impact on thousands of students and their families. These actions are not only procedurally defective, but also arbitrary and capricious and contrary to law.

10. CPS brings this action to protect the students it serves, to enforce compliance with the law, and to secure its due process protections in addressing civil rights compliance.

11. Without such relief, CPS students, particularly those underserved students, will suffer irreparable harm, and the Department's unlawful and procedurally deficient actions will set a dangerous precedent for the arbitrary withdrawal of federal educational resources without due process and contrary to law.

12. This Court's intervention is necessary to ensure that federal law is followed and that the promise of equitable, high-quality education is not undermined by arbitrary agency action.

### III.   JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1346, as this action arises under the Constitution and laws of the United States. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and 42 U.S.C. § 1988.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because Defendants are an agency of the United States Government and officers sued in their official capacities, Plaintiff is a resident of this judicial district, and a substantial part

of the events or omissions giving rise to the claim occurred and are continuing to occur in this district.

## IV.    PARTIES

15. Plaintiff, the Board of Education of the City of Chicago, is responsible for the governance, management, and oversight of Chicago's public school system. CPS is a school district created under the laws of the State of Illinois and operates 630 schools, including district-run, charter, and contract schools. It serves over 300,000 students in the district, making CPS one of the largest school districts in the United States.

16. Defendant, the United States Department of Education, is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411. The Department is responsible for administering and coordinating federal education funding. Among other duties, the Department administers the MSAP grant through its Office of Elementary and Secondary Education (OESE). Through its Office for Civil Rights, it enforces Title IX of the Education Amendments Act of 1972 and Title VI of the Civil Rights Act of 1964.

17. Defendant Linda McMahon is the Secretary of the United States Department of Education and is named in her official capacity.

18. Defendant Kimberly M. Richey serves as the Assistant Secretary for Civil Rights and heads the Department's Office for Civil Rights. This office is responsible for enforcing federal civil rights laws prohibiting discrimination, including Title IX and Title VI.  She was confirmed to that position in October of 2025 by the U.S. Senate.

19. Defendant Lindsey M. Burke is the Deputy Chief of Staff for Policy and Programs and is named in her official capacity. Upon information and belief, Deputy Chief Burke now serves as the Deciding Official for Reconsideration Requests in the United States Department of Education.

5

## V.     FACTUAL BACKGROUND

### A.  Chicago Public Schools

20. CPS serves a large and demographically diverse student population, educating 316,224 students in the 2025-2026 school year. To support its students, CPS employs over 46,000 staff members, including approximately 24,000 teachers, 500 school principals, and a substantial number of aides, counselors, and administrative staff across its 630 schools. In addition to school-based staff, CPS employs central office and grant-funded personnel to carry out compliance and the administration of federally funded programs.

### B.  CPS Magnet Schools and the Magnet School Assistance Program Grants

21. Magnet schools were created in the 1970s as a desegregation strategy designed to combat racial and socioeconomic segregation in public education and serve as an alternative to mandatory busing. Unlike traditional neighborhood schools, magnet schools provide specialized curricula designed to attract students from across traditional attendance areas, drawing diverse student populations that may not otherwise have access to integrated learning environments, and provide additional educational opportunities.

22. MSAP is a federal grant program administered by the Department and authorized through OESE under 20 U.S.C. §§ 7231-7231j. MSAP provides funding to local education agencies (LEAs) or consortia of LEAs to establish or expand magnet schools either under mandatory desegregation plans or voluntary initiatives designed to bring together students of different racial, ethnic, and socioeconomic backgrounds.

23. Congress, in authorizing MSAP, stated that magnet schools "are a significant part of our Nation's effort to achieve voluntary desegregation in schools and help to ensure equal educational opportunities for all students." 20 U.S.C. § 7231(a)(5). Congress also made detailed findings recognizing the educational and societal benefits of magnet schools.

6

Congress emphasized the role of magnet schools in "foster[ing] meaningful interaction among students of different racial and ethnic backgrounds" through magnet programs, asserting that such programs are "in the best interests of the United States." 20 U.S.C. § 7231(a)(4).

24. Historically, MSAP grants were awarded for two-year periods. However, in 2015, Congress authorized five-year grant periods under the Every Student Succeeds Act. *See* Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat. 1802 (2015) (codified at 20 U.S.C. § 7231h); *cf.* No Child Left Behind Act, Pub. L. No. 107–110, tit. V, § 501, 115 Stat. 1425 (2002) (codified at 20 U.S.C. § 7231h). This additional time allows magnet schools to establish and meaningfully scale and implement programs, increasing the likelihood of measurable outcomes and sustained impact. MSAP grants may be awarded for up to five years, with annual awards of up to $3.5 million per LEA or consortium of LEAs. *Id.*

25. Grantees must operate in compliance with federal civil rights laws, including prohibitions against discrimination on the basis of race, color, national origin, religion, sex, or disability. *See* 42 U.S.C. § 2000d. Within the application process, applicants must provide the Department with assurances that it will not engage in such discrimination in student assignments, instructional programming, or extracurricular activities. *See* 20 U.S.C. § 7231d(b)(2)(C)(ii), (iii).

26. MSAP's authorizing statute states that "[n]o grant shall be awarded under this part unless the Assistant Secretary of Education for Civil Rights determines that the assurances described in subsection (b)(2)(C) will be met." OCR, which the Assistant Secretary of Education for Civil Rights oversees, enforces compliance with federal civil rights laws in all Department programs, including MSAP grants.

27. The Department monitors compliance and makes continuation funding decisions based on a grantee's progress toward project goals, submission of required performance and financial goals, and adherence to the eligibility and civil rights requirements. The Department's financial assistance regulations, along with the General Education Provisions Act (GEPA), 20 U.S.C. 1221 et seq., govern the award, continuation, and closeout of the MSAP grants. *See* 34 C.F.R. Part 75; 34 C.F.R. § 280.3.

28. New grants are awarded through a competitive process in which applications are evaluated according to selection criteria and competitive priorities published in the Federal Register. *See* 34 C.F.R. § 75.217; U.S. Department of Education Discretionary Grantmaking at ED. (Oct. 2024).

29. Multi-year continuation awards are non-competitive and contingent upon grantees demonstrating progress toward program objectives, submitting required performance and financial reports, and maintaining eligibility and ongoing compliance with the grant award. *See* 34 C.F.R. §§ 75.118, 75.253. Denial of continuation funding is rare, and when it occurs, grantees are given advanced notice and an opportunity for reconsideration. 34 C.F.R. § 75.253(g); 89 Fed. Reg. 70,300 (Aug. 29, 2024). When the continuation funding is not provided, the Department may authorize a no-cost extension to allow grantees to expend remaining unobligated funds and close out the grant in an orderly manner. 34 C.F.R. § 75.253(h); 2 C.F.R. § 200.308(f)(10).

30. Over the past decade, CPS has repeatedly secured MSAP grants to support magnet schools. In 2017, CPS was awarded almost $15 million to convert neighborhood elementary schools into Science, Technology, Engineering, and Math (STEM)-focused magnet programs. That

funding supported the development of new STEM curriculum, instructional resources, and outreach efforts intended to broaden enrollment and reduce student isolation.

31. In 2022, CPS was again awarded an MSAP grant that provided over $14 million of funding over five years, set to end after the 2026-2027 school year. *See* Exhibit 1: CPS's 2022 MSAP Grant. The funding has been used to support programs at two high-need magnet schools, John J. Pershing STEAM Magnet Elementary School and Maria Saucedo STEAM Magnet Academy. The schools have been using this funding to implement Science, Technology, Engineering, the Arts, and Math (STEAM) programming. The 2022 grant began the third year of implementation at the beginning of the 2025-2026 school year.

32. In 2024, CPS received an additional five-year MSAP grant for approximately $15 million. *See* Exhibit 2: CPS's 2024 MSAP Grant. The funding has been used to support four more high-need elementary schools: Avalon Park Elementary School, Milton Brunson Math & Science Specialty Elementary School, Rudyard Kipling Elementary School, and Logan Square Elementary School. Implementation of the MSAP grant began at the start of the 2025-2026 school year and supports the execution of a personalized learning model, where students play an active role in designing their own learning path and environment. Funding from this award is used to provide professional development, instructional technology and tools, and community partnerships and enrichment opportunities.

33. Through the 2022 and 2025 MSAP grants, CPS was able to purchase innovative materials and equipment to upgrade classroom instruction and learning, including the creation of STEAM and digital media labs. The funds also supported parent labs to ensure parents were engaged in their students' education.

34. CPS has engaged in partnerships with community organizations to extend learning beyond the classroom and provide enrichment experiences and after-school activities. Additionally, MSAP grants supported 13 positions that provided high-quality programmatic implementation, including nine school-level coordinators who work to strengthen instructional practices and programming and four central office staff who deliver professional learning and ensure grant priorities are met.

**C. CPS's Guidelines Regarding the Support of Transgender and Gender Nonconforming Students**

35. In 2014, CPS first adopted formal guidelines to support transgender and gender nonconforming students and staff in its schools. The guidelines clarified that these students should have equal access to educational programs and opportunities, including sports, clubs, and events. Additional versions of the guidelines also addressed access to restrooms and locker rooms consistent with a student's gender identity.

36. These guidelines were expanded in 2019, with CPS's release of its *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students* (the "Guidelines"). The stated goal of the guidelines is "to create an environment in which all students are able to identify and express their gender and achieve healthy development including social, emotional, and academic success." The guidelines are also in compliance with State and local law.

37. The current guidelines address locker rooms and privacy, allowing students to have access to the locker room that aligns with their gender identity or to request reasonable alternative arrangements for privacy. The guidelines also require that all students have access to activities, and when these activities are segregated, students must be included based on

their gender identity. Additionally, the guidelines ensure students are identified by their chosen pronouns and that they have the right to dress consistent with their gender identity.

38. These guidelines are consistent with state and local laws. The Illinois Human Rights Act protects individuals from unlawful discrimination, which includes discrimination against a person based on their "actual or perceived….sex." 775 Ill. Comp. Stat. 5/1-102. This Act protects all students' rights to participate in school athletics consistent with their gender identity. *See id*.

39. The Cook County Human Rights Ordinance prohibits discrimination against a person because of "the actual or perceived….sex." *See* Cook County Code of Ordinances § 42. Finally, the City of Chicago's Human Rights Ordinance requires equal access to public services regardless of sex or gender identity. *See* City of Chicago's Human Rights Ordinance § 6-010-010.

40. Additionally, since 2017, the 7th Circuit Court of Appeals has held that gender identity is included in the definition of sex for the purposes of Title IX. *See, e.g., Whitaker ex rel. Whitaker v. Kenosha Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Doe by & through Doe v. Elkhorn Area Sch. Dist.*, 743 F. Supp. 3d 1053, 1070 (E.D. Wis. 2024); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1036 (S.D. Ind. 2018). Only recently has the Department provided any guidance to rebut this, but this guidance is not yet codified into law. CPS's policies are a reflection of its legal obligations under federal, State, and local law.

41. CPS has maintained guidelines since 2014 that have offered support to students regardless of their gender identity, the whole time receiving MSAP grants.

**D. CPS's "Black Students Success Plan"**

42. CPS's Black Student Success Plan (BSSP) was a policy option developed in response to the State of Illinois's statutory mandate to correct academic and opportunity gaps for Black students. The goal of the plan was to improve longstanding academic and opportunity gaps experienced by Black students, responding directly to documented opportunity gaps by coordinating strategies across instruction, student supports, family engagement, and school climate.

43. The BSSP was also designed to comply with the Every Student Succeeds Act ("ESSA"), which requires LEAs to analyze data for different "subgroups" of students, which are defined as "economically disadvantaged students, students from major racial and ethnic groups, children with disabilities, and English Learners," and use the measurable data to gauge student progress and create avenues for success. See 20 U.S.C. § 6301.

44. The five-year goals for the plan include retaining and hiring representative teachers, closing opportunity gaps, reducing disciplinary actions, increasing culturally responsive practices in classrooms, and fostering belonging among Black students. However, CPS has not implemented the BSSP. Rather, CPS is still in the planning process, including collecting and incorporating feedback from stakeholders and ensuring the program complies with local, state, and federal law.

**E. OCR investigation into CPS's Guidelines and the BSSP**

45. On March 20, 2025, OCR sent a letter to CPS notifying it that the Department had received a complaint that CPS had "policies and practices that force students to share intimate facilities, including restrooms, locker rooms, and overnight accommodations, with members of the opposite sex as a condition of their participation in their education

12

programs and activities, prioritizing 'gender identity' over sex." Exhibit 3: OCR's Title IX Letter at *1.

46. In a March press release, ED stated that the investigation involved allegations that CPS "violated Title IX by requiring girls in the school to share their locker room with a boy." *OCR Launches Investigations into Illinois DOE, the Chicago Public School District 299, and Deerfield Public School District 109 Over Reported Title IX Violations*, U.S. DEP'T OF EDUC. (March 20, 2025), https://www.ed.gov/about/news/press-release/ocr-launches-investigations-illinois-doe-chicago-public-school-district-299-and-deerfield-public-schools-district-109-over-reported-title-ix. As part of the investigation, OCR requested documents from CPS, including their policies and any complaints the District had received. *See* Exhibit 4: OCR's Title IX Data Request.

47. On April 9, 2025, the District responded and provided its policies, including the *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students*, additional documentation, and a narrative regarding its compliance with Illinois State law, county and city ordinances, and Title IX case precedent. *See* Exhibit 5: CPS's Response to OCR's Title IX Letter. As noted in its response, CPS's policies and practices are consistent with state law and current judicial precedent, which interprets the term "sex" in Title IX to include a person's sexual orientation and gender identity. *Id.* at 2. CPS has not received any response from OCR since sending this information.

48. On April 29, 2025, OCR sent CPS another letter stating that it had received a complaint that "alleges that the District discriminates against students on the basis of race by developing and implementing the racially exclusive 'Black Student Success Plan.'" Exhibit 6: OCR's Title VI Letter at *1. In an April press release, ED stated that an investigation

13

was based on a complaint that the BSSP "violates Title VI by focusing on remedial measures only for black students, despite acknowledging that Chicago students of all races struggle academically." *U.S. Department of Education's Office for Civil Rights Launches Title VI Investigation into Chicago Public Schools*, U.S. DEP'T OF EDUC., (Apr. 29, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-launches-title-vi-investigation-chicago-public-schools.

49. On May 14, 2025, CPS responded to OCR's Letter and the document request and provided policies, planning documents, and other responsive documents. *See* Exhibit 7: CPS Response to OCR's Title VI Letter. CPS also provided a narrative with data on student test scores, graduation rates, and college enrollment outcomes. *Id.* In the narrative and the responsive documentation, CPS demonstrated its compliance with Title VI, and specifically 34 C.F.R § 100.3, which requires recipients to "take affirmative action to overcome the effects of prior discrimination" and allows recipients to "take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." *Id.*

50. CPS understands that such investigations are a routine part of the Department's mandate to enforce federal law and ensure that the most vulnerable students are able to access education. CPS has worked, and intends to continue working, cooperatively with OCR to resolve any noncompliance.

51. However, to date, OCR has not engaged in any further communication with CPS regarding the two investigations. OCR has not issued a determination or a Letter of Finding or attempted to negotiate a resolution agreement in either matter, as is required in Section 303 of the Department's Case Processing Manual. OFF. OF CIVIL RIGHTS, U.S. DEP'T OF EDUC.,

CASE PROCESSING MANUAL 18 (2025) ("OCR will issue a letter of finding(s) [for noncompliance determinations"). Despite Section 702(d) of the Case Processing Manual referring to interviews as "an integral part of investigations," *id.* at 29, it is CPS's understanding that no interviews have been conducted in either matter.

52. Because only initial steps had been taken, CPS believed that the OCR complaint process was in the early stages. CPS had no indication that the MSAP or other programs would be discontinued as a result of these pending investigations.

**F. ED's Illegal Discontinuation of CPS's MSAP Grants**

53. On September 16, 2025, CPS received a letter from Craig Trainor, then Acting Assistant Secretary in OCR at the Department, discontinuing its MSAP grant (Non-Continuation Letter) (Trainor has since been replaced by Kimberly Richey, who has been confirmed to the position of Assistant Secretary). *See* Exhibit 8: Non-Continuation Letter.

54. The Non-Continuation Letter states that "CPS' Guidelines Regarding the Support of Transgender and Gender Nonconforming Students, are facially discriminatory on the basis of sex in violation of Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and its implementing regulation, 34 C.F.R. Part 106.1." *Id.* at *2.

55. The letter further states that "OCR is deeply concerned that CPS appears to be discriminating based on race in violation of Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100, through its exclusionary 'Black Students Success Plan.'" *Id.* at *1.

56. The Non-Continuation Letter calls the BSSP "textbook racial discrimination," asserting that "no justification proffered by CPS can overcome the patent illegality of its racially exclusionary plan." *Id.* at *2. The Non-Continuation Letter then asserts that "[a]s a result

of these *findings*, I will not certify CPS' grant under 20 U.S.C. § 7231d(c). Likewise, CPS' MSAP grant will be non-continued under 34 C.F.R. § 75.253(a)(5) because it is no longer in the best interest of the Federal Government." *Id.* at *3 (emphasis added).

57. The Department is clear in its Non-Continuation Letter that it has made the decision not to continue the MSAP grant based on a determination by OCR that CPS is violating Title VI and Title IX.

58. For "reconsideration" of the discontinuance, the Department outlined nine actions, including robust policy changes, that CPS must take to come into compliance, offering only three days to effect such changes. *Id.* at *3-4. This contravenes the required process for discontinuing a grant award based on perceived violations of Title VI and Title IX, and denies CPS any semblance of adequate due process. *See Am. Ass'n. of Univ. Professors v. Trump,* No. 25-CV-07864-RFL, 2025 WL 3187762 at *2 (N.D. Cal. Nov. 14, 2025) (finding that plaintiffs were likely to succeed on the merits of their claim that the Department's refusal to continue grants was based on Title IX and VI violations and did not comply with those requirements).

### 1. *Non-Compliance with Title VI and IX Procedural Requirements*

59. This action does not concern a dispute over the terms and conditions of a federal award. Rather, it arises from the Department's failure to comply with the required procedures imposed under Title VI and Title IX in taking adverse action against CPS.

60. Regulations for enforcement of Title VI at 34 C.F.R. § 100.8 require OCR to first attempt to resolve noncompliance by voluntary means and, if unsuccessful, to then issue an express finding on the record and allow for a hearing before refusing to continue a federal award.

These same procedural protections are incorporated by reference into 34 C.F.R. Part 106 for purposes of Title IX enforcement. *See* 34 C.F.R. § 106.81.

61. The Non-Continuation Letter indicates that ED disregarded these procedural requirements. OCR may discontinue federal funding to enforce compliance with nondiscrimination laws only "after opportunity for hearing." 20 U.S.C. § 1682; *See* 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.8(c)(2). Further, the Department must provide a 30-day notice before funding to an LEA can be deferred during administrative appeals for noncompliance with civil rights requirements. 20 U.S.C. § 1232i(b)(1).

62. It is apparent in the Non-Continuation Letter that ED's discontinuance of the MSAP awards is an enforcement action related to CPS's alleged noncompliance with civil rights requirements. It states, "*As a result of these findings*, I will not certify CPS' grant under 20 U.S.C. § 7231d(c)," clearly using the Title IX and Title VI findings as justification for the discontinuation. Exhibit 8 at *3.

63. Further, the Non-Continuation letter aligns with OCR's letters to CPS in March and April of 2025, notifying CPS of the investigation and asking for additional information. In the Non-Continuation Letter, ED states that CPS's Title IX guidelines are "facially discriminatory" and that "allowing males in girls' sports, intimate facilities, or private spaces, such as with overnight sleeping accommodations or vice versa, violates Title IX by creating a hostile educational environment or denying females and males equal access to benefits of education programs or activities," echoing OCR's Title IX Letter, where the Department said CPS's policies were alleged to "force students to share intimate facilities…" Exhibit 8 at *3; Exhibit 3 at *1.

64. The Non-Continuation Letter also calls the BSSP "designed for and exclusive to black students and black educators" and that "no justification proffered by CPS can overcome the patent illegality of its racially exclusionary plan," which aligns directly with OCR's Title VI Letter, where the Department said that it was investigating if the BSSP was "racially exclusive." Exhibit 8 at *2; Exhibit 6 at *1.

65. The only allegations the Department relied on to withdraw CPS's MSAP funding are the same issues CPS is already working cooperatively with OCR to resolve. Yet, despite CPS's demonstrated commitment to reaching a voluntary resolution with OCR, including through addressing OCR's concerns regarding the planning of the BSSP and working cooperatively with OCR on its policies, ED bypassed the required procedural steps and immediately discontinued funding for civil rights noncompliance without affording CPS with notice and hearing rights, as required under 34 C.F.R. § 100.8, 20 U.S.C. § 1232i, 20 U.S.C. § 1682 and 42 U.S.C. § 2000d-1.

### 2. Non-Compliance with MSAP Statute and Education Department General Administrative Regulations, including 34 C.F.R. § 75.253

66. Moreover, the Non-Continuation Letter is unsupported by the MSAP statute and applicable regulatory requirements. The letter relies on 20 U.S.C. § 7231d, which discusses MSAP grant *application* requirements, including a determination by the Assistant Secretary of Education that the required assurances for civil rights compliance will be met.

67. Yet, no application for funding is at issue here; CPS met the application and related assurance requirements for its MSAP awards in 2023 and 2025. However, in determining ongoing compliance with civil rights requirements, civil rights statutes specifically speak to agency enforcement through the discontinuation of grants, and the relevant procedures to take such action. 20 U.S.C. § 1682; 42 U.S.C. § 2000d-1.

18

68. Further, even if a determination under 20 U.S.C. § 7231d(c) applied to MSAP continuation grants (which it doesn't), the Department has established no nexus between the alleged violations of civil rights laws and CPS's administration of MSAP.

69. Specifically, the Assistant Secretary's determination is limited to civil rights compliance respecting:

(i) the hiring, promotion, or assignment of employees of the applicant or other personnel for whom the applicant has any administrative responsibility;

(ii) the assignment of students to schools, or to courses of instruction within the schools, of such applicant, except to carry out the approved plan; and

(iii) designing or operating extracurricular activities for students[.]" 20 U.S.C. § 7231d(b)(2)(C).

70. The Non-Continuation Letter makes no findings or allegations regarding any of the three permissible grounds to or any specific, MSAP project-based civil rights compliance concerns. Instead, the letter focuses exclusively on generally applicable policies already under investigation by OCR and attempts wholesale Title VI and IX enforcement.

71. OCR also writes that continuing CPS's MSAP grant is "no longer in the best interest of the Federal Government," citing 34 C.F.R. § 75.253(a)(5). Exhibit 8 at *3. However, the Department has not eliminated or discontinued the program entirely. Rather, it has only sought to discontinue grants for a few recipients, including CPS, based on its determination of noncompliance with civil rights laws. *See* @EDSEecMcMahon, X (Sept. 17, 2025, 4:51 PM) (Secretary McMahon posted on the website X.com on September 17, 2025, singling out these districts, saying, "@USEdGov will not certify that Magnet Schools in New York City, Chicago, & Fairfax Public Schools are following the law when they are clearly not.

They have three days to come into compliance. The clock is ticking."); *see also Bd. of Educ. of the City Sch. Dist. of the City of N.Y. v. U.S. Dept. of Educ.*, No. 25 Civ. 08547 (S.D.N.Y.).

72. This further demonstrates that the discontinuance of funds is a means of targeted enforcement for specific grantees, and the statement that the grant is not "in the best interest of the Federal Government" reflects the Department's view of the specific grant as implemented by the discontinued grantees rather than its assessment of the program as a whole.

73. This raises further questions about what, exactly, OCR identified in the district's programs that was not "in the best interest of the Federal Government" -- but that question is not addressed in the letter. This is plainly a post hoc rationalization.

74. The Department uses 34 C.F.R. § 75.253(a)(5) as broad authority to terminate grants at its will. This is reflected on a Department website that asserts ED may discontinue grants that "violate the letter or the purpose of Federal civil rights law." *Department Grant Discontinuation and Termination Processes*, U.S. DEP'T OF EDUC., https://www.ed.gov/grants-and-programs/manage-your-grant/department-grant-discontinuation-and-termination-processes.

75. That regulation is not so broadly drawn as to allow the Department to use it to avoid the procedural requirements set out in civil rights statutes. If so, the Department could side-step the Congressionally-mandated procedures required before discontinuing funding on the basis of civil rights violations simply by saying it is not in the best interest of the government. *Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025) (enjoining the government's termination of

20

grants without following civil rights procedures, holding "[n]othing permits an agency to 'regulate away' the statutory commands imposed by Congress in Title VI and IX in that manner.").

76. In a recent summary judgment decision involving a grant continuation dispute, the district court explained that the "best interests" evaluation under 34 C.F.R. § 75.253 does not authorize ED to "use the continuation process to establish new grant priorities and apply them retroactively without the procedural protections Congress expressly applied to Department grant programs." *Washington v. U.S. Dep't of Educ.*, No. C25-1228-KKE, 2025 WL 3690779 at *14 (W.D. Wash Dec. 19, 2025). The court further emphasized that "nothing in the existing regulatory scheme comports with the Department's view that multi-year grants may be discontinued whenever the political will to do so arises. Thus, … the Court disagrees that the regulatory scheme contemplates that it would be based, as here, on unpublished policy preferences unrelated to the progress of grant projects." *Id.* at *12.

77. In fact, the Department published interpretive guidance related to Title IX in 2021, which clarifies that Title IX prohibits discrimination based on sexual orientation and gender identity, consistent with the Supreme Court decision in *Bostock v. Clayton County*. *See* 86 Fed. Reg. 32637 (June 22, 2021). The administration has not yet rescinded that guidance, which also requires specific actions for OCR to follow in Title IX investigations. When the Department attempted to issue policy guidance under Title VI last year, the district court issued a decision preventing ED from implementing the guidance, stating that the guidance attempted to extend Title VI beyond its limits. *See Am. Fed'n of Tchrs v. U.S. Dep't of Educ.*, SAG-25-628, 796 F.Supp.3d 66 (D. Md. 2025).

78. The Department recently voluntarily dismissed its appeal of that decision. 796 F. Supp. 3d, *dismissed*, No. 25-2228 (Jan. 1, 2026). Therefore, the Department's own interpretation of its "best interests" may be inconsistent with the law and regulations.

79. Nor does ED's discontinuance provide an adequate opportunity to seek reconsideration, as required by 34 C.F.R. § 75.253(g). In order for the decision to be reconsidered, ED's letter demanded that nine actions be taken within three days, which included eliminating the BSSP (which had not been implemented yet), adopting new Title VI and Title IX policies, rescinding existing policies, and making several public statements regarding the same. *See* Exhibit 8 at *3-4.

80. This required CPS to agree to fully adopt the Department's interpretation of Title VI and Title IX in order to even be entitled to pursue reconsideration, revealing that ED's goal was simply to circumvent the required OCR procedures. This abbreviated amount of time also did not allow CPS to accurately review and evaluate the Letter and proposed actions, let alone allow for the District's stakeholders to be informed of and implement the policies.

81. CPS must be given an "effective chance to respond to crucial facts," and the opportunity must come "'at a meaningful time and in a meaningful manner.'" *Carson Products Co. v. Califano*, 594 F.2d 453, 459 (5th Cir. 1979) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In response to the Non-Continuation Letter, CPS asked for an additional 30 days as part of its reconsideration request to address OCR's concerns, as well as a request for additional information and answers to questions regarding the decision. *See* Exhibit 9: CPS's Response to Non-Continuation Letter.

82. OCR rejected CPS's request, noting that CPS must "implement the remedial measures articulated" in the September 16 letter, and "[f]ailure to do so will result in a denial of

reconsideration," and that the decision to non-continue the MSAP grants will stand. Exhibit 10: OCR's Response to CPS at *1. CPS responded again, stating that the request was unreasonable and that the Department denied CPS a response to its questions and the necessary information to respond to the allegations contained in the Non-Continuation Letter. *See* Exhibit 11: CPS's Final Response.

83. Conditioning CPS's reconsideration request on CPS's adoption of new civil rights policies under an unreasonable timeline, without offering CPS an opportunity to defend its underlying policies' compliance, creates a false choice—either the district can choose to comply with the Department's demands and forgo its due process, or be forced to do so.

84. It is evident that the Department engaged in Title IX and Title VI enforcement actions without first following the very clear standards of law. The Department's decision not to continue CPS's MSAP grants violates CPS's right to due process, as the Department has decided to take enforcement action before continuing through the required administrative process, in addition to being arbitrary and capricious.

85. The denial of adequate due process is, in itself, a violation of a fundamental constitutional and statutory right, and is considered a form of legal harm, regardless of whether a different outcome would have been reached had proper procedures been followed.

**G. Impact of MSAP Grant Non-Continuation**

86. By denying CPS an opportunity for a hearing before taking enforcement action against CPS for alleged Title VI and Title IX noncompliance, CPS is facing irreparable harm to its programs. As a result of the non-continuation and unrelated to the quality of the program or compliance with MSAP grant requirements, CPS will not receive close to $17 million in remaining grant funding over the balance of the two grants. This directly impacts CPS's

ability to implement and sustain programming supported by these awards. For just the 2025-2026 school year alone, CPS projects that it is losing $8 million.

87. In response to the non-continuation of the MSAP grant—with notice coming just days before the continuation awards would have been received, CPS had to cover multiple expenses from other funds. CPS invested $800,000 to pay for the salaries of the 13 employees who support the two MSAP grants. Eliminating these positions would directly threaten the success of the new educational programs at the schools, as these programs are still in the early stages of implementation.

88. To minimize disruption to student learning, CPS has used $400,000 in contingency funds to continue teacher-led out-of-school programming for students, as well as professional learning for teachers. Further, in order to honor existing commitments, CPS has expended $86,000 in contingency funds to support student enrichment experiences and student and parent-focused social-emotional learning and programmatic learning.

89. As a result of the non-continuation, CPS has been unable to provide funds for supplies, materials, and equipment to support the development of robust programs at magnet schools. CPS has terminated its contract with the American Institutes for Research (AIR) to provide evaluation services, including recommendations for improvement and impacts on students and families.

90. Additionally, CPS halted capital improvement projects related to MSAP, which had been aimed at providing equitable, high-quality educational options for families.

91. The abrupt discontinuation of MSAP funding without notice, hearing opportunity or any semblance of adequate due process, significantly undermines the work that CPS has

engaged in for over 10 years in developing high-quality and diverse magnet school programs.

## VI.    CAUSES OF ACTION

### COUNT I

**Violation of the Administrative Procedure Act (APA) through Agency Action Without Observance of Procedure Required by Law and in Excess of Statutory Authority (Title VI and Title IX)**

92. Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

93.  The APA requires a court to "hold unlawful and set aside an agency action, findings, and conclusions found to be" either "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), and those made "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

94. The Department is an "agency" under the APA. 5 U.S.C. § 551(1).

95. The non-continuation of CPS's MSAP grant constituted final agency action under 5 U.S.C. § 704 because the terminations were "the consummation of [the] agency's decisionmaking process" by which the Department "determine[d]" CPS's legal "rights." *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489, 493 (7th Cir. 2023) (citation modified).

96. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and the Department's implementing regulations at 34 C.F.R. Part 100, all prohibit civil rights discrimination in federally funded programs.

97. At the same time, Congress unambiguously required the Department to adhere to specific procedural processes before taking enforcement actions against recipients suspected of violating those provisions. *See* 20 U.S.C. §§ 1682, 1232(i); 42 U.S.C. § 2000d-1. Such

enforcement actions include the "refusal to grant or *to continue assistance under such program or activity*" in which noncompliance has been found. *See* 20 U.S.C. § 1682 (emphasis added).

98. The Department then promulgated regulations giving effect to 20 U.S.C. § 1682 and 42 U.S.C. § 2000d-1. *Establishment of Title & Chapters*, 92 Fed. Reg. 30802, 30918-30 (May 9, 1980), *codified at* 34 C.F.R. Part 100.

99. The Department's regulations, grounded firmly in statutes, prohibit the termination or non-continuation of grant funding unless and until the grantee has been afforded, *inter alia*, 1) a determination that compliance cannot be secured through voluntary meetings, 2) notice by the Department of the recipient's failure to comply, and 3) an opportunity for an on-the-record hearing held in accordance with the applicable provisions of the Administrative Procedures Act. *See* 34 C.F.R. § 100.8(c)(1), (2); *see also* 34 C.F.R. § 100.9; 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

100. Defendants neglected to determine whether compliance with Title VI or Title IX could be secured by voluntary means. *Cf.* 34 C.F.R. § 100.8(c)(1).

101. Defendants failed to provide CPS with adequate notice of the factual and legal basis for any alleged Title VI or Title IX violation. *Cf.* 34 C.F.R. § 100.9(a)(1).

102. Defendants failed to make any express findings on the record before an "officer designated in accordance with 5 U.S.C. 3105 and 3344." *Cf.* 34 C.F.R. § 100.9(b) (referencing the Administrative Procedure Act's administrative law judge provisions).

103. Indeed, there was no hearing at all. *Cf.* 34 C.F.R. § 100.9(d)(1) (requiring the hearing to be "conducted in conformity with [the APA's on-the-record provisions at 5 U.S.C. §§ 556-57]").

104.     The Department's regulations implementing Title VI and Title IX stipulate that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until … there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed" by Title VI and/or Title IX. *Cf.* 34 C.F.R. § 106.81 (incorporating by reference the procedural provisions at 34 CFR § 100.8(c)).

105.     Then, the agency must "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." 42 U.S.C. § 2000d-1; 20 U.S.C § 1682.

106.     By non-continuing the MSAP grants on the basis of alleged civil rights violations without adhering to Title VI and Title IX's enforcement framework, Defendants circumvented Congress' carefully constructed procedural safeguards.

107.     Therefore, Defendants' actions were made in excess of statutory authority and without observance of procedure required by law, in violation of the APA, 5 U.S.C. 706(2)(C), (D).

**COUNT II**

**Violation of the Administrative Procedure Act through Agency Action Without Observance of Procedure Required by Law and in Excess of Statutory Authority (GEPA)**

108.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

109.     Defendants' action in non-continuing Plaintiff's MSAP grants constitutes a final agency action subject to review under the APA. 5 U.S.C. § 706(2)(C), (D).

27

110.     The General Education Provisions Act (GEPA) specifies procedural protections

owed to LEAs that receive federal funds. Specifically, GEPA requires that:

"Federal financial assistance to a local educational agency may not be limited,

deferred, or terminated . . . on the ground of noncompliance with . . . any []

nondiscrimination provision of Federal law unless such agency is accorded the right

of due process of law, which shall include—

(1) at least 30 days prior written notice of deferral to the agency, setting

forth the particular program or programs which the Secretary finds to be

operated in noncompliance with a specific provision of Federal law;

(2) the opportunity for a hearing on the record before a duly appointed

administrative law judge within a 60-day period (unless such period is

extended by mutual consent of the Secretary and such agency) from the

commencement of any deferral;

(3) the conclusion of such hearing and the rendering of a decision on the

merits by the administrative law judge within a period not to exceed 90 days

from the commencement of such hearing, unless the judge finds by a

decision that such hearing cannot be concluded or such decision cannot be

rendered within such period, in which case such judge may extend such

period for not to exceed 60 additional days . . ."   Education Amendments,

Pub. L. 94-482, 90 Stat 2232-33 (codified at 20 U.S.C. § 1232i(b)).

111.     CPS is an LEA, as defined by GEPA. *See* 20 U.S.C. § 7801(30).

112.     Defendants' Non-Continuation Letter provided three days to respond to the alleged civil rights noncompliance before discontinuing the MSAP awards, rather than the requisite 30 days required by GEPA.

113.     In response, CPS requested that it be afforded due process, or at least, be provided 30 days to request reconsideration of the discontinuance decision; both requests were denied.

114.     Defendants promptly terminated CPS's MSAP funding based on the determination of noncompliance with nondiscrimination provisions, less than two weeks after first issuing written notice, and without initiating, conducting or completing any enforcement proceeding consistent with Title VI, Title IX, or GEPA.

115.     Defendants' failure to follow Title VI, Title IX, and GEPA's statutorily-mandated enforcement procedures regarding notice and hearing rights, as well as their own regulations, renders their actions unlawful.

116.     Accordingly, Defendants acted "in excess of their statutory [] authority" and "without observance of the procedure required by law," in violation of the APA, and Defendants' actions must be vacated and set aside under 5 U.S.C. § 706(2)(D).

## COUNT III

**Violation of the Administrative Procedure Act through Agency Action Without Observance of Procedure Required by Law (MSAP, EDGAR)**

117.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

118.     MSAP is authorized under 20 U.S.C. §§ 7231-7231j, and requires applicants to assure that they will: "not engage in discrimination based on race, religion, color, national origin, sex, or disability in −

(i) the hiring, promotion, or assignment of employees of the applicant or other personnel for whom the applicant has any administrative responsibility;

(ii) the assignment of students to schools, or to courses of instruction within the schools, of such applicant, except to carry out the approved plan; and

(iii) designing or operating extracurricular activities for students[.]" 20 U.S.C. § 7231d(b)(2)(C).

119.   CPS provided these requisite assurances with its applications for MSAP funding, and OCR's Assistant Secretary determined the same in issuing CPS's grant awards.

120.   The Education Department General Administrative Regulations (EDGAR) at 34 C.F.R. Part 75 require specific requirements for making multi-year continuation awards.

121.   Multi-year continuation awards are non-competitive and contingent upon grantees demonstrating progress toward program objectives, submitting required performance and financial reports, maintaining eligibility and compliance, and continuing in the interest of the Federal government.[1] 34 C.F.R. §§ 75.118, 75.253.

---

[1] Defendants also lack statutory authority to enforce civil rights actions through their chosen mechanism of enforcement. The Defendants rely on 34 C.F.R § 75.253 for their decision to non-continue, but the underlying statutes for that regulation are general grants of authority to the Secretary. *See* 20 U.S.C. §§ 1221e-3, 3474. The Defendants also rely on a certification provision in the underlying organic statute, but ignores the more specific enforcement provisions that require OCR to provide certain procedural protections. *Cf.* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. This court should "hesitate before concluding that Congress meant to confer [the] authority" to refuse certification based on any of the foregoing statutes without adhering to the more specific statutes offering procedural protections discussed above. *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–2608 (2022); c*ompare*, 20 U.S.C. § 1682, *with* 20 U.S.C. § 7231d(c). This is especially true given the "history and breadth of the authority" the agency-proffered statutes have historically been interpreted to provide, as well as the "vast economic and political significance" that such an assertion of authority under 34 C.F.R. 75.253 would have on grant recipients around the country, especially considering the parallel provisions for formula grant funding under 34 C.F.R 76.253. *Id.*; *see Christy Wolfe, U.S. Dep't of Education 101: Federal Funding in K-12 Education*, BIPARTISAN POL'Y CTR. (AUG. 19, 2025), https://bipartisanpolicy.org/explainer/u-s-department-of-education-101-federal-funding-in-k-12-education ("[t]otal funding from the Department of Education to support K-12 students was $45 billion in fiscal year 2025").

122.     34 C.F.R. § 75.253 states that if the Secretary decides against making a continuation award, they must "notify the grantee of that decision, the grounds on which it is based, and, consistent with 2 C.F.R. § 200.342, provide the grantee with an opportunity to request reconsideration of the decision."

123.     Defendants have failed to provide CPS with adequate notice that it failed to comply with the MSAP assurances under 20 U.S.C. § 7231d(b)(2)(C). In fact, Defendant's do not allege any facts related to the three specific civil rights infractions mentioned in 20 U.S.C. § 7231d(b)(2)(C).

124.     Nor have Defendants provided CPS with a genuine opportunity to request reconsideration of the decision under 34 C.F.R. § 75.253(g), as the reconsideration offer was conditioned on compliance.

125.     In the Non-Continuation Letter, Defendants state that CPS "appears to be discriminating," but fails to provide any concrete findings of the same.

126.     Defendants' actions, therefore, violate the APA, 5 U.S.C. § 706(2)(D) by exceeding their authority under EDGAR and civil rights enforcement authorities under MSAP.

## COUNT IV

**Violation of the Administrative Procedure Act through Arbitrary and Capricious Agency Action**

127.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

128.     Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).

31

129.     An agency action is arbitrary or capricious when it is not transparent and not

"reasonable and reasonably explained." *FCC v. Prometheus Radio Projec*t, 592 U.S. 414,

423 (2021). Instead, an agency must provide "a satisfactory explanation for its action[,]

including a rational connection between the facts found and the choice made." *Motor*

*Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (citation modified). An agency cannot "depart from a prior policy sub silentio" or

simply disregard its prior practice. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515-

16 (2009). Nor may an agency "fail to consider an important aspect of the problem." *State*

*Farm*, 463 U.S. at 43. Rather, when changing positions, agencies must "provide a reasoned

explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U. S. 211, 221–222

(2016).

130.     Defendants' decision not to make a continuation award to CPS fails these basic

requirements. First, Defendants did not provide a reasoned explanation demonstrating *how*

CPS's policies violated any of the civil rights laws cited. To be sure, Defendants cited facts

and listed laws, but they failed to meaningfully connect or explain how the facts *led* to their

chosen outcome.

131.     Defendants also failed "to consider an important aspect" of CPS's continuation

decision when it completely ignored controlling 7th Circuit precedent that extends Title

IX's protections to gender identity. *See*, *e.g.*, *Whitaker ex rel. v. Kenosha Sch. Dist. No. 1*

*Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017). The Defendants further ignored all but one of

the regulatorily-mandated factors for continuation decisions. *See* 34 C.F.R. §§ 75.253(b),

75.118. Finally, they failed to consider Congress's express declaration of "the best interest

of the United States" for the program, 20 U.S.C. § 7231(a)(4), which includes "ensur[ing]

32

that all students have equitable access to a high-quality education," 20 U.S.C. § 7231(a)(4)(B). Defendants' refusal to explain, much less acknowledge, how their decision is appropriate in light of these factors, underscores their failure to take into account several important aspects of the CPS MSAP continuation decision.

132.    Furthermore, Defendants disregarded the criteria that their own regulations require when determining whether to issue a continuation award. MSAP continuation decisions are governed by 34 C.F.R. § 75.253, which requires the Department to issue the grounds on which the decision is made and provide the grantee with an opportunity for reconsideration. Defendants did not follow those requirements, as no actual opportunity for reconsideration was provided.

133.    Next, Defendants arbitrarily and without notice or legal support state that CPS's BSSP and Guidelines violate federal civil rights requirements—a conclusion not yet reached through the ongoing investigations. Defendants did not follow the procedural requirements in 34 C.F.R. § 100.6 that apply to both violations of Title VI and Title IX. In fact, Defendants have ignored, or have failed to inform CPS of any review of, CPS's submissions in the pending Title VI and Title IX investigations. The failure of the Defendants to follow the Department's own regulations is the epitome of arbitrariness. *See Watts v. United States*, 2017 WL 7794597, at *5 (N.D. Ill. Dec. 8, 2017); *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990) (agencies "must abide by [their] own regulations").

134.    Defendants are changing their long-standing position whereby the Department considered non-continuation measures only after attempting other remedies, and instead are proceeding directly to the option of last resort: cessation of funding. *See* DEP'T OF

EDUC., ACSH-OFO-006, HANDBOOK FOR THE DISCRETIONARY GRANT PROCESS (2023); *see also Boucher v. United States Dep't of Agric.*, 934 F.3d 530, 547-48 (7th Cir. 2019) (holding action arbitrary and capricious where the agency failed to follow its own guidance).

135.     In so doing, Defendants ignore the serious reliance interests of CPS. These interests are two-fold. First, CPS depended on the repeated past approvals of their MSAP program to budget forward into future years. These past approvals for substantively similar programs generated the well-founded belief on CPS's part that their program, at the bare minimum, complied with the law. Second, CPS relied on its cooperative back-and-forth with OCR through the ongoing investigative process to ensure its districtwide policies comply with federal civil rights requirements.

136.     Therefore, CPS is entitled to a declaratory order and an order and judgment enjoining the Department's non-continuation decision as arbitrary and capricious; rescinding, vacating, and setting aside the non-continuation; and enjoining the Department from implementing, maintaining, or reinstating the non-continuation without adherence to required procedures.

## COUNT V

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) through Agency Action without Notice and Comment Rulemaking

137.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

138.     The APA requires an agency to publish a rule in the Federal Register and allow the public the option of submitting comments and information before promulgating new

34

regulations. *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553).

139.     GEPA requires the Department to follow this notice and comment procedure when changing its rules regarding civil rights enforcement. *See* 20 U.S.C. § 1221e-4.

140.     The Department has not engaged in any notice and comment procedures in relation to interpretations of Title VI and Title IX required procedures.

141.     Therefore, the Department cannot take enforcement actions and impose coercive conditions that rely on new interpretations of anti-discrimination regulations until it promulgates regulations in accordance with GEPA and the APA.

142.     CPS is entitled to a declaratory order and an order and judgment enjoining the Department's non-continuation of MSAP grants for the reasons set forth in the Letter pursuant to 5 U.S.C. § 706(2)(D).

## COUNT VI

### Implied Right of Action, Nonstatutory Review, and Ultra Vires Actions;
### Violation of Fifth Amendment (Due Process)

143.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

144.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires due process of law before depriving someone of a constitutionally protected interest. *Cf. Carson v. Block*, 790 F.2d 562, 566 (7th Cir. 1986) (no specific procedures required where deprivation is unrelated to life, liberty, or property).

145.     Plaintiff here has a constitutionally protected property interest in the discontinued grant funding that supports student success across Chicago's public magnet schools.

146.     The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required.

147.     Defendants' actions alleged herein establish unconstitutionally vague standards for determining whether federal funding will be discontinued.

148.     Defendants' procedures were constitutionally inadequate or unfair.

149.     Defendants did not provide adequate notice and opportunity to be heard before depriving CPS of its constitutionally protected interest.

150.     Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 326-27 (2015).

151.     Absent injunctive and declaratory relief declaring unlawful and enjoining the ED's discontinuance of CPS's MSAP awards without affording adequate due process, CPS and its students will be immediately, continuously, and irreparably harmed by the ED's unconstitutional actions.

## COUNT VII

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), through Agency Action Contrary to the Constitution**

152.     Plaintiffs incorporate and reallege all of the preceding paragraphs as if fully set forth herein.

153.     Defendants violated the Due Process Clause of the Fifth Amendment to the United States Constitution when issuing their non-continuation decision.

154.     The Fifth Amendment provides "two essential[]" elements of "due process: notice of the case against [CPS] and a meaningful opportunity to respond." *Califano*, 594 F.2d at 459.

155.     Defendants' non-continuation of CPS's MSAP grants failed to respect the procedural protections that Congress has repeatedly granted through varying statutes to recipients of Department of Education grants. These procedural protections define what a "meaningful opportunity to respond" looks like in the context of civil rights enforcement matters.

156.     Further, agencies are required to "reconsider [the] entire case" when a reconsideration request is received, and must "reevaluat[e]" the "request in light of [the] rebuttal statements." 594 F.2d at 459.

157.     But there is no evidence that Defendants reviewed, much less considered, CPS's response. Instead, Defendants conditioned their reconsideration on CPS's acquiescence to the Department's demands.

158.     Defendants' actions also create a specter of ambiguity that arises from the Department's failure to adequately rationalize their decisions. In so doing, they have left grant recipients across the country scrambling to identify where the new threshold for problematic policies lies. In short, recipients do not "know what is required of them so they may act accordingly." *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 989 (N.D. Ill. 2025) (finding an Executive Order violated the Fifth Amendment's void for vagueness doctrine), *quoting FCC*, 567 U.S. at 253 (2012).

159.     CPS is entitled to a declaratory order and an order and judgment enjoining the Department's non-continuation of MSAP grants for the reasons set forth in the Letter pursuant to 5 U.S.C. § 706(2)(B).

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff CPS prays that the Court:

a. Declare and order that the Department's non-continuation of CPS's MSAP grants be rescinded, vacated, and set aside as having been taken without the statutorily and regularly required procedures and as arbitrary and capricious, contrary to law, and an abuse of discretion;

b. Permanently enjoin the Department from implementing, maintaining, or reinstating the non-continuation, or otherwise taking any other action to suspend, terminate, withhold, or refuse to continue CPS's MSAP grants on the basis of alleged civil rights violations without providing CPS with the required due process, including notice and hearing rights;

c. Declare and order that the Department deem CPS's MSAP grants to be (a) certified as complying with federal civil rights laws pursuant to 20 U.S.C. § 7231d(c); and (b) continued pursuant to 34 C.F.R. § 75.253(a), unless and until the Department follows required procedures to discontinue funding on the basis of civil rights noncompliance, including notice and hearing rights;

d. Declare and enjoin the Department from freezing, terminating, or otherwise interfering with any of CPS's MSAP grant funding based on Department findings of alleged Title VI or Title IX violations without complying with required procedures under Title VI, Title IX, and Department procedures;

e. Issue other appropriate declaratory and injunctive relief as required to effectuate paragraphs a-d above;

f. Retain jurisdiction of this case for the purpose of supervising the Department's full compliance with the Court's Order;

g. Award CPS reasonable attorney's fees and costs in bringing this litigation; and

38

h. Grant such other and further relief as this Court may deem proper.

Dated: March 13, 2026

Respectfully submitted,

/s/ *Yasemine Givan*
Yasemine Givan
Senior Assistant General Counsel
Chicago Public Schools
1 N. Dearborn St.
Suite 900
Chicago, Illinois 60602
(773) 553-1700

Bonnie Graham*
Brandi Wills*
The Bruman Group, PLLC
1120 20th St NW Suite 700
Washington, DC 20036
(202) 965-3652
bgraham@bruman.com
*Outside Counsel for CPS*

*\*Pro hac vice forthcoming*